GENERAL FREIGHT SERVICES, INC., A/C LAMB-WESTON, INC. *v.* UNITED STATES

Court No. 69/34481–10194

LAMB-WESTON, INC. *v.* UNITED STATES

Court No. 69/38803–10256

NORTH PACIFIC CANNERS & PACKERS, INC. *v.* UNITED STATES

Court No. 69/11593–9717

(Decided March 31, 1975)

*Glad, Tuttle & White (Jonathan K. Bellsey* of counsel) for the plaintiffs.
*Irving Jaffe*, Acting Assistant Attorney General (*Velta A. Melnbrencis*, trial attorney), for the defendant.

MALETZ, Judge: These three jointly tried actions concern the proper dutiable status of quick frozen silverskin onions imported from Holland in 1968 and 1969 via the port of Portland, Oregon. The onions were classified by the government under item 138.00 of the tariff schedules which provides for "Vegetables, fresh, chilled, or frozen, and cut, sliced, or otherwise reduced in size (but not otherwise prepared or preserved)," and assessed with duty at the rate of 17.5% ad valorem. They are claimed by plaintiffs to be properly dutiable at 1.75 cents per pound under item 136.91 which, in conjunction with its superior heading, covers "Vegetables, fresh, chilled, or frozen (but not reduced

in size or otherwise prepared or preserved): * * * Onions: * * * Other."

For purpose of greater clarity, the provisions of the tariff schedules in issue are reproduced below:

Classified under:

| 138.00 | Vegetables, fresh, chilled, or frozen, and cut, sliced, or otherwise reduced in size (but not otherwise prepared or preserved) | 17.5% ad val. |
|---|---|---|

Claimed under:

Vegetables, fresh, chilled, or frozen (but not reduced in size nor otherwise prepared or preserved):

*     *     *     *     *     *     *

Onions:

*     *     *     *     *     *     *

| 136.91 | Other | 1.75¢ per lb. |
|---|---|---|

The sole issue in these actions is whether or not the onions at bar have been "reduced in size" within the intendment of item 138.00 and the superior heading to item 136.91.

## I

The record in the present case includes (1) the record in *North Pacific Canners and Packers* v. *United States*, 64 Cust. Ct. 551, C.D. 4034 (1970) which was incorporated herein; (2) plaintiffs' interrogatories and defendant's cross-interrogatories propounded pursuant to commissions to Cornelis van den Doel of Holland and his responses thereto (van den Doel was the president during the time pertinent here of A. Zwanenburg & Co. N.V. of Holland, which grew, harvested, processed and exported the onions at bar); and (3) the testimony of defendant's witness, Cornelius Rietveld of Kouts, Indiana, who had been in the onion farming business for some 40 years, had been growing silverskin onions regularly since 1965, and was at one time in the onion processing business.

Mr. van den Doel's replies to interrogatories and cross-interrogatories in this and the incorporated case may be summarized as follows: The imported onions, as harvested range from 10–16 millimeters in size, i.e., diameter.[1] After harvesting, the onions retain their roots, leaves and tops and are covered with a certain amount of soil. They arrive at the processing plant in this condition where the following steps are taken to freeze and pack them: The onions are first washed with water in a rotating machine; then machine-trimmed to cut off

---

[1] A millimeter is 0.03937 of an inch. Thus, expressed in inches, the diameter of the imported onions is from out 0.39 to 0.62 inches.

the roots, leaves and tops (which are inedible); separated according to size depending on buyer specifications; graded according to quality; blanched by heating to 167° F. for five minutes to remove enzymes and protect the color; cooled; and finally frozen and packed. During the washing and trimming process, the onions usually lose their thin outer skin or covering which has a thickness of about 20 microns.[2] This occurs because the outer skin is less adhesive than the normal rings. Aside from removal of the outer skin, the onions are never peeled. Further, they still have the same diameter after processing as when they come from the field except for the reduction caused by loss of the outer skin and an immeasurable increase caused by freezing. After importation (as indicated in the incorporated record), the onions are mixed with peas, to which seasoning is added, and packed in cartons.

According to van den Doel, the silverskin onions with the outer skin or covering still intact are suitable for human consumption both before and after cooking. In fact, his company packs onions with some of the skin intact in jars of vinegar and they are consumed in this state.

Defendant's witness Cornelius Rietveld (as indicated previously) has been in the business of growing onions for some 40 years and growing silverskin onions regularly since 1965. He was also at one time in the onion processing business. His testimony related to the marketing of silverskin onions in the United States and was in summary as follows: In this country, silverskin onions are called pearl onions.[3] They range in size from 10-25 millimeters in diameter and are used for brining, freezing, and canning. At the time of harvesting, the onion has a top that is beginning to mature and dehydrate and this top—which is loose—is removed mechanically with a mowing device. However, to prevent injury to the onion, about an inch or more of the top (which resembles a stem) remains on the bulb at the time it is harvested. The roots of the onion are removed from the ground with a rooting device, with the roots still on the onions at the time of harvesting. Also remaining on the onion at the time of harvesting is the outer layer of skin which serves as the onion's natural defense mechanism against decay. Growers and farmers market fresh onions in the foregoing condition, i.e., with a one inch top, root and outer skin remaining.[4]

---

[2] A micron is a thousandth part of one millimeter. It is to be added that the witness van den Doel stated in response to a cross-interrogatory that all his company's onions are processed to meet "the highest customers specifications * * *." Thus the company would have to meet specifications which state that the onions must be well trimmed and practically free of pieces, stripes, roots, tops, blemishes, and attached hard skin. In this latter connection, the specifications also provide that no more than 3 percent by count in a given sample may show one or more of these defects. Within this 3 percent, the specifications prescribe that no more than 1 percent of the onions may have all or a portion of "the tough outer skin remaining attached."

[3] For convenience, the term "silverskin onions" will refer hereafter to pearl as well as silverskin onions.

[4] According to the witness, no farmers in the United States who grow silverskin onions are engaged in the business of freezing them.

When farmers sell silverskin onions to a processor for freezing, the latter cleans the onions by washing them in water; grades them by size; removes the outer skin, the top, and root; blanches and freezes them and then markets them as frozen onions. The removal of the outer layer is essential to the freezing process and all processors in this country remove it prior to freezing. One reason this is done is to make the onion more appealing to the consumer. For, according to Mr. Rietveld, were the outer layer not removed it would become harder and harder and would have to be peeled off by hand before consuming it or separated in the mouth and spit out since it is not an edible portion of the onion. In the witness' words, "[i]t would be like eating the shucks with the corn * * * ." (R. 69.) Other reasons requiring removal of the outer skin in the freezing process are the need to compete with silverskin onions from Holland and the necessity of meeting customer specifications. The witness stated that a conscious effort was required to remove the onion's outer layer of skin, though there are several general methods of doing so, such as by abrasion, controlled air, burning or lye-peeling. In short, before frozen silverskin onions in the United States are marketable to the consumer, the outer layer of skin has to be removed as does the root and top.[5]

During the process of harvesting, up to 40 percent of the outer layer of skin may become removed depending upon the humidity and the time of day the operation took place. However, the witness' own practice is to avoid harvesting under conditions producing more than 15 percent outer layer removal. The optimum state in harvesting is to have the entire outer layer intact thereby providing the greatest protection against decaying organisms.

The testimony of Rietveld also indicates that in the areas with which he is familiar the primary market for fresh silverskin onions is in sales to processors. In this connection, the witness sells his entire production of such onions to processors because consumer demand for fresh silverskin onions is very limited and the market is too inconsistent.[6] However (as noted before), when growers do sell directly to the consumer through stores, roadside markets or stands, the fresh onions are sold as they come from the ground, i.e., with the root, top, and outer skin remaining thereon. Similarly, fresh onions are normally sold to processors in this condition.

---

[5] The witness Rietveld expressed the opinion that the removal of the outer skin of the onions reduces their size but that a tolerance of one-sixteenth of an inch is permissible.

[6] Elaborating on this latter aspect, the record shows that while a grower usually can receive a higher price when he sells onions to the supermarket or directly to the consumer than when he sells to a processor, the reason why more onions are not sold directly to supermarkets or consumers is the inconsistency of supply and demand. For example, there would be no way to market 100 acres of onions ( Rietveld's current silverskin production within a period of six weeks in such consumer channels.

## II

We turn now to the legal aspects starting with *United States* v. *The Hothouse Products Corp., Quinn & Werner,* 21 CCPA 261, T.D. 46789 (1933). The question there involved was whether endives imported from Belgium were properly classifiable as "Vegetables in their natural state" under paragraph 774 of the Tariff Act of 1930, which provided for:

> Vegetables in their natural state, * * * not specially provided for, * * *.

The importer claimed the merchandise to be dutiable under paragraph 775 of the Tariff Act of 1930, which provided for:

> Vegetables * * * if cut, sliced, or otherwise reduced in size, * * * not specially provided for * * *.

Prior to importation about 20 percent of the outer leaves had been removed by the grower. The record showed that such leaves were always removed by the grower before placing them on the market, both in this country and in Belgium. In this context, the court was called upon to construe the meaning of the words "reduced in size" as used in paragraph 775. The court stated (p. 263):

> * * * We are of the opinion that Congress did not intend by this language that all vegetables reduced in size from the condition in which they are taken from the ground should be classified under paragraph 775. To so hold would exclude many vegetables, like cabbage and celery, from classification as "vegetables in their natural state" under paragraph 774, if decayed leaves of the cabbage were removed or the root of the celery stalk were severed.

The court in *Hothouse Products* then discussed the case of *United States* v. *Strohmeyer & Arpe Co.,* 167 F. 533 (2d Cir. 1909) which held that imported cauliflowers which had been trimmed, washed and packed in brine for preservation during transportation were classifiable as "Vegetables in their natural state," rather than as "vegetables, prepared or preserved." [7]

---

[7] The following excerpt from the opinion in *Strohmeyer* (167 F. at 534) was then quoted by the court in *Hothouse Products* (21 CCPA at 263):

> The Board and the Circuit Court concur in the opinion that the importers' contention is well founded, and we see no reason for reaching a different conclusion. The question, briefly stated, is whether the imported cauliflower, concededly a vegetable, when it arrived at the port of entry was in its natural state or prepared or preserved.
> The tariff act, like all statutes, must be given a common-sense construction. If paragraph 257 be construed literally it would result in the prohibition of the importation of all vegetables, for the moment a vegetable is cut from its growing stem or taken from the ground it ceases, in this restricted sense, to be in its natural state. If an exceedingly strict construction were adopted, it would exclude vegetables which have been washed or trimmed or from which decayed or superfluous leaves or stems have been removed; for these too, strictly speaking, are not in their natural state. Of course such a construction is absurd and no one contends to the contrary. The statute must be so interpreted as to give force to the evident intent of Congress to permit vegetables, as they are known and dealt with in this country, as they come from the farm and garden, to enter by paying a duty of 25 per cent.

After considering *Strohmeyer*, the court in *Hothouse Products* stated (21 CCPA at 263-4):

> In harmony with the foregoing, we are of the opinion that it was the intent of Congress that vegetables should be regarded as being in their natural state, and not reduced in size, if the ordinary and usual process employed by the grower is to remove even a substantial percentage of the outer leaves before placing them on the market. It is our opinion that when Congress used the words "reduced in size," it contemplated, with reference to vegetables of this character, *a reduction in size beyond the point that such vegetables are ordinarily reduced in size as an incident of placing them in a marketable condition.* In other words, if endives, as grown in this country and abroad, are not usually sold or dealt in without removing a part of the leaves, then with such leaves removed they are in their natural state and not reduced in size in a tariff sense. [Emphasis added.]

> The testimony abundantly establishes the fact that a portion of the leaves of endives is always removed by the grower before placing them on the market, both in this country and in Belgium, and that, except at the beginning of the season, the leaves removed are thrown away in the field.

> Had there been any testimony that endives were also marketed by farmers without the removal of a portion of the leaves we might come to a different conclusion, but upon the record before us we are constrained to hold that the lower court was in error in holding that the endives here involved had been "reduced in size" within the meaning of those words as used in said paragraph 775, and hold that the merchandise was correctly classified by the collector.

The same meaning for "reduced in size" has been carried over into the tariff schedules. See *Border Brokerage Company, Inc.* v. *United States,* 60 Cust. Ct. 487, C.D. 3437, 284 F. Supp. 806 (1968). Against this background, we consider *North Pacific Canners and Packers* v. *United States,* 64 Cust. Ct. 551, C.D. 4034 (1970) the record in which (as previously indicated) was incorporated in the present actions. That case involved quick frozen silverskin onions imported from Holland which were the same as the onions involved in the present case. As here, the onions were classified under item 138.00 and claimed to be classifiable under item 136.91. Thus the issue—as in the case at bar—was whether the imported onions were "reduced in size" within the meaning of item 138.00. In a 2-1 decision, the Third Division of this court held that plaintiff had failed to prove its affirmative claim and therefore overruled its protest. More specifically, the majority noted that "the pertinent cases have established that the phrase 'reduced in size' means 'reduction in size beyond the point

that such vegetables are ordinarily reduced in size as an incident of placing them in marketable condition.' " 64 Cust. Ct. at 555. It then pointed out that plaintiff had the dual burden of proving not only that the government's classification was erroneous but that its claimed classification was correct. As to the latter aspect, the majority stated (*ibid.*):

> On the record herein, which bears, in essence, on the processing of the subject merchandise in Holland, and not at all on the marketing practices in this country with regard to such vegetables, we find that plaintiff has failed to discharge its burden of proving that the onions at bar are not cut, sliced, or "reduced in size" as that term is defined in the *Hothouse Products* and *Border Brokerage* cases, *supra*, and that they come within the claimed classification.[8]

In short, in *North Pacific Canners*, the court's conclusion was predicated on plaintiff's failure to introduce evidence of the marketing practices in this country with regard to frozen silverskin onions. By contrast the record in the present case provides ample evidence of the marketing in the United States of frozen silverskin onions and supports plaintiffs' contention that the imported onions in issue are not reduced in size. The frozen onions at bar, upon importation, had been cleaned; had had their roots and tops removed; and had had their outer layer of skin dislodged in most instances. This, the record makes clear, is the identical condition in which frozen silverskin onions are marketed to the consumer by processors who freeze onions in the United States. As defendant's witness Rietveld testified, in order to market such onions to the consumer in this country, the United States processor cleans the onions; has their roots and tops removed; and has their outer layer of skin removed. Indeed Rietveld added that removal of the onion's outer layer of skin is essential to the freezing process and all processors in this country remove it. Whether this outer layer is removed inadvertently during the freezing process (as plaintiffs' witness stated) or deliberately during the processing operation (as defendant's witness testified) is not of paramount im-

---

[8] The dissenting judge stated in part (64 Cust. Ct. at 555):

The issue in this case is whether frozen onions, in the condition imported, were reduced in size. That is a question of fact.

Going no further than the facts as to the processing of the frozen onions discussed in the majority opinion with the case law, I am satisfied that plaintiff has made a *prima facie* showing that the frozen onions were not reduced in size. I would, accordingly, sustain the protests.

There was, as the majority states, an immeasurable increase in the size of the onions caused by freezing. With reference to vegetables of the character of these imported frozen onions, it seems to me implicit that the "immeasurable outer film" which "mostly" disappears during the freezing process was no more than the ordinary consequence of placing them in a marketable frozen condition. *United States* v. *The Hothouse Products Corp., Quinn & Werner*, 21 CCPA 261, T.D. 46789 (1933). There is no evidence to the contrary.

portance to a determination of these actions. What is crucial is the fact that in both Holland and the United States not only is the outer layer removed, but must be removed (either deliberately or as an incident of the freezing process).

Summing up, in both the United States and Holland the silverskin onions' roots, tops and their outer layer of skin are virtually always removed as an incident of placing them in a marketable frozen condition. Thus, the imported frozen silverskin onions are not "reduced in size" beyond the point that such vegetables are ordinarily reduced in size as an incident of placing them in a marketable condition.

Defendant, however, argues that the articles of commerce in question are onions as they come from the field and that like other vegetables an onion is " 'reduced in size' for tariff purposes if it has been reduced beyond the form in which it comes from the farm and the field, in which it is marketed by the farmer and the grocery man." (Br. p. 14.) On this matter, defendant places heavy reliance on the Tariff Commission *Summaries of Trade and Tariff Information,* Schedule 1, Vol. 7, p. 115 (1968) which indicates that domestic production supplied about 98 percent of the fresh onions consumed in 1963–1967 and that in 1967 an estimated 85 to 90 percent of the onion crop was consumed fresh. Thus, defendant adds, "it can be assumed that during the relevant period (1967 and 1968), most of the onions consumed in the United States consisted of domestically produced *fresh* onions." (Br. p. 26.) [Emphasis in original.] Since most of the onions in the United States are consumed fresh and since fresh onions in the United States are marketed with their roots, tops and outer skin, defendant contends (i) that the removal of the tops, roots and outer skin of onions is not an incident to their marketability in the United States; and (ii) that because the onions at bar no longer possess their tops, roots, and skin, they have been "reduced in size" for tariff purposes and cannot be classified under item 136.91.

There are several difficulties with this argument, however. In the first place, the articles at issue consist of frozen silverskin onions which were assessed with duty under item 138.00 which covers "Vegetables, fresh, chilled, or frozen, and cut, sliced, or otherwise reduced in size (but not otherwise prepared or preserved)." Similarly, the superior heading to item 136.91—the item which plaintiffs claim to be applicable—covers "Vegetables, fresh, chilled, or frozen (but not reduced in size or otherwise prepared or preserved)." Thus, these provisions include vegetables whether fresh, chilled, or frozen and, in this respect, it must be emphasized that the terms fresh, chilled, or frozen are joined by the conjunction "or" which when given its clear disjunctive

meaning requires that the terms be considered as mutually exclusive alternatives. Hence these provisions were obviously intended to cover fresh vegetables, chilled vegetables, or frozen vegetables as separate and distinct articles of commerce.

Second, acceptance of defendant's argument that *fresh* onions are the appropriate articles of commerce, would make a nullity of the provisions of item 136.91 to the extent that that item covers frozen silverskin onions not reduced in size. For under defendant's view, even though such frozen onions are always marketed with the tops, roots, and outer skin removed, they would still have to be treated for tariff purposes as *fresh* onions and thus necessarily would always have to be considered as reduced in size.

What is more, the very Tariff Commission *Summaries of Trade and Tariff Information,* Schedule 1, Vol. 7 (1968) on which defendant (as observed previously) places considerable reliance, militates against defendant's position. Thus in discussing the scope of item 138.00 under which the importations were classified and which (to repeat) covers fresh, chilled or frozen vegetables *reduced in size* (but not otherwise prepared or preserved), the following is stated in the *Summaries* (p. 173):

> Included in this summary are all fresh, chilled, or frozen vegetables which have, within the tariff meaning, been reduced in size by cutting, slicing, or other methods but which have not been otherwise prepared or preserved. Well known examples of the vegatables included here are cut corn, broccoli, spinach, french and regular cut green beans, and diced and regular-cut carrots. The vegetables covered herein are most often marketed in a frozen condition, inasmuch as they are usually considerably less perishable in that condition than when fresh or chilled. Notable exceptions, however, are tossed salad and cole slaw mixturce which are usually marketed in a chilled condition.
>
> *Some of the major frozen vegetables are not included in this summary because* they have been further processed (e.g., frozen french fried potatoes), or *they are not considered to be reduced in size for tariff purposes (e.g., frozen peas which have been shelled and brussels sprouts which have had the outer leaves removed and the bases cut).* * * * [Emphasis added.]

From the foregoing, it is apparent that frozen vegetables are considered a separate article of commerce. Further, it must be concluded that just as frozen peas which have been shelled and frozen brussels sprouts which have had their outer leaves removed and bases cut are not considered to be reduced in size, so too frozen onions such as those involved here which had their tops, roots and outer skin removed both

in Holland and this country as an incident of placing them in a marketable condition cannot be considered as reduced in size.

Defendant further argues that in the *Strohmeyer* case, *supra*, 167 F. 533 (1909)—the reasoning in which was followed in the *Hothouse Products* case, *supra*, 21 CCPA 261 (1933)—"the Court did not compare *brined* imported and domestic vegetables but looked to how fresh vegetables are known and dealt with in the United States, how they come from the farm and garden." (Br. p. 32.) However, in each of these cases the issue was whether or not the importations were "Vegetables in their natural state," thus necessitating inquiry into the manner in which *such* vegetables were marketed as they came from the farm. Thus in *Strohmeyer* the merchandise consisted of cauliflower, trimmed, washed, and packed in brine for preservation during transportation. The competing provisions were paragraph 257 of the Tariff Act of 1897, which covered "Vegetables in their natural state" and paragraph 241 of that Act, which covered "vegetables, prepared or preserved." In *Hothouse Products* the merchandise consisted of endives with a substantial portion of the outer leaves removed and the competing provisions involved paragraph 774 of the Tariff Act of 1930, which covered "Vegetables in their natural state" and paragraph 775 of that Act which covered "Vegetables * * * reduced in size." It is readily discernible that none of the tariff provisions involved in these cases included a specific enumeration or description for frozen vegetables nor was the merchandise at issue a frozen vegetable. Hence, when the court discussed "vegetables * * * as they come from the farm" in the *Strohmeyer* case it was referring to vegetables similar to those then before the court and not "frozen" vegetables. Similarly in *Hothouse Products* the court specifically enumerated "endives" in its qualifying statement and thus limited its decision to those articles before the court. It should be further noted that the decisions in these cases were promulgated in 1909 and 1933, respectively, which can be judicially noticed as being prior to the advent of commercial frozen vegetables.

Lastly, defendant relies on *Border Brokerage*, *supra*, 60 Cust. Ct. 487 (1968) as supporting its position that in determining whether or not frozen vegetables have been reduced in size, the court must determine how such vegetables are marketed in their fresh state. In that case, plaintiff claimed that frozen fiddlehead greens which had been cut at harvest from their roots were improperly classified under item 137.70 providing for "Vegetables * * * frozen (but not reduced in size nor otherwise prepared or preserved)," since they were cut, or

reduced in size, within the meaning of item 138.00. The court rejected this contention, stating (60 Cust. Ct. at 489):

> * * * [P]laintiff's argument that the act of harvesting vegetables is itself such a cutting, or reduction in size, as the tariff schedules contemplate, seems to us also to be specious. Vegetables are articles of commerce that are bought, sold and imported, as vegetables. They are not the growing vegetables of horticulture, useless in commerce *qua* vegetables until the plants have been harvested.
>
> The cutting, or reduction in size, of vegetables, which the tariff schedules describe, is the cutting or reduction in size of the commercial vegetable. Here we have no proof of any such processing. Indeed, the proofs are to the contrary, that the only cutting of these greens was the severance incident to harvesting.
>
> That this is the rule is too well established to call for extensive citation of authorities. It suffices to refer to the opinion of our appeals court in *United States* v. *The Hothouse Products Corp., Quinn & Werner,* 21 CCPA 261, T.D. 46789, * * *.

With these considerations in mind, defendant's reliance on *Border Brokerage* is misplaced. For there the issue was not raised as to whether it was necessary for the court to compare the processing of imported frozen greens with the processing of such greens in their fresh state at and after harvest. Nor indeed was that issue relevant in that case since aside from freezing, the frozen and fresh greens were marketed in precisely the same physical condition, namely cut at harvest from their roots.

In summary, it is held that the imported silverskin onions are properly dutiable at 1.75 cents per pound under item 136.91. Plaintiffs' claims are therefore sustained and judgment will be entered accordingly.

